UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

LISA DONOFRIO-FERREZZA,

                              Plaintiff,                    04 Civ. 1162 (PKC)

            -against-

                                                   MEMORANDUM
                                                __AND ORDER__

RUTH NIER and FRANCESCA STERLACCI,

                              Defendants.
----------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

            Plaintiff Lisa Donofrio-Ferrezza is a knitwear design artisan.  In August 1993, she became affiliated with the Fashion Institute of Technology ("FIT"), first as a part-time instructor in knitwear design and later as a full-time instructor and assistant professor.  The plaintiff alleges that defendants Ruth Nier and Francesca Sterlacci, FIT faculty members, defamed her and tortiously interfered with her employment relationship with FIT.  Specifically, plaintiff asserts that she was defamed (and her relationship with FIT impaired) by defendants' remarks delivered during a closed faculty meeting held to consider whether to grant plaintiff tenure.  At that meeting, plaintiff failed to receive sufficient votes to be reappointed with tenure.

            Donofrio filed her complaint in this action on February 13, 2004.  Subject matter jurisdiction exists by reason of diversity of citizenship and an amount in controversy in excess of the jurisdictional threshold.  28 U.S.C. § 1332.  There are four claims pled in the complaint:  the first and second are for defamation and tortious interference with a business relationship as against defendant Nier and the third and fourth assert the same legal theories against defendant Sterlacci.

Discovery is now closed, and the defendants have moved for summary judgment seeking the dismissal of plaintiff's claims. Drawing all reasonable inferences in favor of the non-movant, I conclude that defendants are entitled to summary judgment. Virtually all of the statements uttered by the two defendants to their faculty colleagues in the course of a closed meeting held as part of the tenure review process were not defamatory as a matter of law. New York law provides protection—absolute immunity—to statements, which, viewed in their context, are statements of opinion or are statements that are either true or substantially true.

Those statements that, viewed in a light most favorable to plaintiff, could be viewed as defamatory are nevertheless protected by New York's qualified privilege afforded to statements made in furtherance of a legitimate common interest, such as the evaluation on an employer's behalf of the performance of a fellow employee. New York permits the qualified privilege to be defeated by "malice" on the part of the speaker. In opposition to defendants' motion for summary judgment, plaintiff has failed to raise a genuine and material dispute of fact as to whether the statements were made with "malice," as defined in New York, and, accordingly, summary judgment is granted dismissing the complaint. Defendants also cannot be held liable on a tortious interference claim because, for these limited purposes, New York law treats the defendant faculty members as if they were parties to the contract of employment between plaintiff and defendants' employer, FIT. To proceed on a theory of tortious interference with a contract between a plaintiff and a defendant's employer, the defendant must be have acted outside the scope of her authority. There is no evidence that either defendant did so.

<u>Background</u>

For the purposes of this motion, I have accepted plaintiff's version of the facts as true, supplemented by such facts proffered by the defendants that have not been disputed by plaintiff. Plaintiff received an associate's degree and a bachelor's degree from FIT in 1984 and 1986, respectively. (Donofrio Aff. ¶ 2) She thereafter entered the fashion industry as a knitwear designer, working full-time until 1996 when she began to work as a freelance designer. (Donofrio Aff. ¶ 3) The plaintiff began teaching at FIT in 1993 as an adjunct instructor. (Pl. Resp. to Def. 56.1 ¶ 11) She taught part-time from fall 1993 through spring 2000. (Pl. Resp. to Def. 56.1 ¶ 13) In August 2000, FIT appointed plaintiff to a full-time teaching position, and in 2001 she applied for a promotion to assistant professor. (Pl. Resp. to Def. 56.1 ¶ 15; Donofrio Aff. ¶ 9) The Fashion Design Department approved the merit promotion, which was made retroactive and constituted a tenure-track position. (Donofrio Aff. ¶ 9)

Defendants Nier and Sterlacci are faculty members at FIT, where they work in the Apparel Area of the Fashion Design Department. (Pl. Resp. to Def. 56.1 ¶ 1) Sterlacci chaired the department from spring 2002 through August 2004. (Pl. Resp. to Def. 56.1 ¶ 6) Nier has taught at FIT since approximately 1978, and, like plaintiff, specializes in knitwear. (Pl. Resp. to Def. 56.1 ¶¶ 7-8) The parties and other staff and faculty are members of a collective bargaining unit at FIT, and a collective bargaining agreement ("CBA") governs the appointment, reappointment, and tenure of FIT faculty members. (Pl. Resp. to Def. 56.1 ¶¶ 3-4)

In the context of this case, tenure is the right of a person to remain in his or her position of employment during good behavior and competent service. (Pl. Resp. to Def.

56.1 ¶ 18)  A tenured employee may not be removed from a position except for good cause.  (Id.)  FIT's tenure process requires non-tenured faculty to be evaluated each semester for three years, with reappointment each semester as a necessary precondition for tenure.  (Pl. Resp. to Def. 56.1 ¶ 19)  A faculty member receives tenure after being reappointed to a seventh semester.  (Id.)  Each semester, department meetings occur to evaluate tenure-track faculty and decide whether tenure-track faculty should be reappointed.  (Pl. Resp. to Def. 56.1 ¶ 21)  Departmental decisions are made by secret ballot among eligible part-time and full-time faculty members, and are governed by the CBA.  (Pl. Resp. to Def. 56.1 ¶ 22)  A simple majority is required for decisions respecting appointments, reappointments and tenure.  (Id.)  Under the CBA, evaluations of faculty must include both peer observations and student assessments.  (Pl. Resp. to Def. 56.1 ¶ 23)   Campus administrators, including the FIT president, then review departmental votes on appointment.  (Pl. Resp. to Def. 56.1 ¶ 25)

During plaintiff's work as a full-time tenure track faculty member, she was reappointed five times without controversy.  (Donofrio Aff. ¶ 11)  On September 17, 2002, when the Fashion Design Department considered reappointing plaintiff to a sixth full-time semester, nine department members voted for her reappointment and nine voted against it.  (Pl. Resp. to Def. 56.1 ¶¶ 28-29)  At that meeting, neither defendant offered an opinion before the vote about plaintiff's reappointment.  (Pl. Resp. to Def. 56.1 ¶ 34)  Upon learning that her teaching appointment would not be renewed, plaintiff submitted a statement arguing that departmental members voted against her because she was pregnant, asserting that "no other reasons were ever given or stated to me by anyone."  (Pl. Resp. to Def. 56.1 ¶ 30)  She further contended that the September 17 meeting failed to comply with established departmental procedure because no departmental members confronted her with their

criticisms, thus depriving her of an ability to respond to specific criticisms. (Pl. Resp. to Def. 56.1 ¶ 33) FIT's president, Dr. Joyce F. Brown, overturned the department's vote and appointed plaintiff to the spring 2003 semester even though other university officials recommended that the department's vote should stand. (Pl. Resp. to Def. 56.1 ¶ 37)

Plaintiff asserts that prior to the September 2002 vote, the only indication she had that her future tenure status may have been in doubt arose in June 2002, when defendant Sterlacci indicated that some design department faculty were concerned that plaintiff was not supportive of defendant Nier's candidacy as departmental assistant chair. (Donofrio Aff. ¶ 15) Donofrio perceived Sterlacci's remarks as a threat that Donofrio would face some sort of workplace retaliation if she did not support Nier's candidacy. (Donofrio Aff. ¶¶ 15, 17)

With plaintiff's reappointment to a sixth semester of full-time teaching, she was eligible for tenure in spring 2003. (Pl. Resp. to Def. 56.1 ¶ 38) On February 25, 2003, the Fashion Design Department met to discuss whether to reappoint plaintiff for a seventh time, and thus grant her tenure. According to plaintiff, defendants Nier and Sterlacci made factually inaccurate statements about plaintiff that resulted in her losing the reappointment. (Donofrio Aff. ¶¶ 20-21)

Defendant Nier read aloud a one-and-a-half page statement concerning plaintiff. (Pl. Resp. to Def. 56.1 ¶ 46) According to plaintiff, two of Nier's comments were false and now form the basis for plaintiff's legal action against her. In one passage, plaintiff contends that defendant Nier knowingly lied about plaintiff's role in a knitwear curriculum subcommittee to imply that plaintiff's role on the committee was obstructive or otherwise unconstructive. (Donofrio Aff. ¶¶ 22-24) Plaintiff contends that this statement was defamatory and tortiously interfered with plaintiff's employment at FIT. (Compl. ¶¶ 56-57)

In addition, plaintiff contends that Nier knowingly lied about a software donation that plaintiff secured for FIT and falsely attributing the donation to another person. The plaintiff contends that these remarks were defamatory and tortiously interfered with her relationship with FIT. (Compl. ¶ 58)

As to Sterlacci, plaintiff attributes several allegedly defamatory statements to her at the February 25 meeting. One statement related to Donofrio's interviewing of applicants for the international program:

> [Donofrio] refused to screen all applicants for the IFD program, even at the request of the VP of Academic Affairs, which resulted in numerous problems for the International Program both here and abroad. (Compl. ¶ 61)

In addition to her work with the international program, Sterlacci criticized plaintiff because of the negative reviews of her performance by students. Sterlacci stated that she was concerned about students' reviews of plaintiff's teaching, describing them as "inconsistent" during her two years as a full-time instructor:

> Twice she received scores that were well below the college standard. In the Fall of 2000 she received a score of 4.41 in AP 334 Hand Knit Design Concepts. Negative student comments included "she is not willing to explain things," "she needs more patience," "needs more demonstrations," "leaves class room for long periods," "should be in class more often" and "punctuality not a virtue." In Spring 2002 [Donofrio] received a score of 4.18 for AP 333 Knitwear Design Concepts. Other negative student comments refer to her "condescending attitude toward students," "control issues" and "did not display she wanted to teach more things."

(Compl. ¶ 62) It is undisputed that plaintiff twice received two scores in knitwear courses that were below the college standard of 4.5 out of a possible 6: one of 4.41 and one of 4.18. (Pl. Resp. to Def. 56.1 ¶¶ 100-01, 103) Plaintiff notes that several full-time tenure track faculty have received average scores below 4.5. (Donofrio Aff. ¶¶ 43-47)

Sterlacci also stated at the February 25 meeting that when Donofrio received "an extremely low score from one of her classes in Spring 2001, she got it expunged", a statement that plaintiff asserts was false and defamatory. (Compl. ¶ 63)  In addition, Sterlacci stated at the February 25 meeting, "upon receiving a less than favorable peer evaluation by a senior faculty member in Fall 2000, [Donofrio] insisted on having another evaluation done." (Compl. ¶ 64)  Sterlacci also criticized plaintiff's lack of input as to the design for an industrial knitwear lab that FIT was proposing to construct and plaintiff asserts that the statements made by Sterlacci in this regard were false and defamatory.  (Compl. ¶ 59)

At the February 25 meeting – after faculty met in closed session and discussed Donofrio's tenure appointment – plaintiff was given the opportunity to respond to the comments critical of her.  She disputed a number of them, and subsequently a secret vote was taken.  (Pl. Resp. to Def. 56.1 ¶¶ 148-49)  Plaintiff asserts that Sterlacci did not give a full and accurate accounting of the criticisms that were levied against her in the closed session, as required by the CBA.  (Donofrio Aff. ¶ 54)  Eleven votes favored her reappointment with tenure, eleven votes opposed her reappointment with tenure, one vote abstained, and one vote was left blank.  (Pl. Resp. to Def. 56.1 ¶ 150)  Plaintiff does not know who voted for reappointment with tenure, and who opposed it.  (Pl. Resp. to Def. 56.1 ¶ 151)  In March 2003, plaintiff submitted a rebuttal to the faculty criticisms levied against her.  (Pl. Resp. to Def. 56.1 ¶ 157)  In May 2003, FIT President Brown upheld the faculty's vote and denied plaintiff's application for reappointment with tenure.  (Pl. Resp. to Def. 56.1 ¶ 159)

While this motion was sub judice, I was informed that a labor arbitration involving FIT and plaintiff's union had concluded that the process by which FIT had determined not to reappoint plaintiff violated the CBA.  Fashion Institute of Technology v.

<u>United College Employees of F.I.T., N.Y.S.U.T., A.F.T.</u>, AAA Case No. 13-300-02933-03 (2005) (Brent, Arb.).  The arbitrator remanded the matter to the Fashion Design Department Apparel Area Tenure and Promotion Committee for reconsideration of plaintiff's tenure application.  <u>Id.</u>  While the arbitration decision is illuminating as to the terms of the CBA and the employer's adherence to it, the decision does not control any issue necessary to a resolution of this motion.

<u>Summary Judgment Standard</u>

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief.  A fact is material if it "might affect the outcome of the suit under the governing law . . ." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law.  <u>Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 244 (2d Cir. 2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant.  Fed. R. Civ. P. 56(e).  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material

facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'"

Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v.

United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The Court must

"view the evidence in the light most favorable to the non-moving party and draw all

reasonable inferences in its favor, and may grant summary judgment only when no

reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64

F.3d 77, 79 (2d Cir. 1995) (quotations and citations omitted); accord Matsushita Elec. Indus.

Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). In reviewing a motion for summary

judgment, the court must scrutinize the record, and grant or deny summary judgment as the

record warrants. Fed. R. Civ. P. 56(c). In the absence of any disputed material fact,

summary judgment is appropriate. Id.

Discussion

I. Defendants' motion is granted as to plaintiff's defamation claims.

Defendants argue that their statements are protected by the absolute privilege

afforded to statements of opinion. In the alternative, the defendants contend that summary

judgment dismissing plaintiff's claims is appropriate because their statements are protected

by a qualified privilege recognized under New York law. Lastly, defendants contend that,

even if the Court concludes that their statements were assertions of fact and not assertions of

opinion, plaintiff, in opposition to their initial showing, has come forward with no evidence

that the statements were untrue.

A statement is defamatory if "'it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.'" Rinaldi v. Holt, Rinehart & Winston, Inc., 42 N.Y.2d 369, 379 (1977), cert. denied, 434 U.S. 969 (1977). To establish a defamation claim, New York law requires that a plaintiff prove "(1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff." Boyd v. Nationwide Mut. Ins. Co., 208 F.3d 406, 409 (2d Cir. 2000).

"It is axiomatic that truth is an absolute, unqualified defense to a civil defamation action . . . and that substantial truth is all that is required." Nyitray v. Johnson, 1998 WL 67651, *10 (S.D.N.Y. Feb. 19, 1998) (quoting Smith v. United Church Ministry, Inc., 212 A.D.2d 1038, 1039 (4th Dep't 1995)). This defense requires only that the "gist or substance of the challenged statements be true," not that they be completely accurate. Printers II, Inc. v. Prof'ls Publ'g, Inc., 784 F.2d 141, 146 (2d Cir. 1986) (considering the truth defense in the context of a libel claim). Despite the label "truth defense," it is "well-established … [that] a plaintiff in a defamation action has the burden of showing the falsity of factual assertions." Prozeralik v. Capital Cities Commc'ns, Inc., 82 N.Y.2d 466, 473 (1993). See also Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776 (1986) ("We believe that the common law's rule on falsity – that the defendant must bear the burden of proving truth – must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.").

Unlike the United States Constitution, the New York Constitution provides absolute immunity from defamation claims for statements of opinion. Celle v. Filipino

Reporter Enters., Inc., 209 F.3d 163, 178 (2d Cir. 2000). To determine whether a statement

is a fact or an opinion for purposes of a defamation claim, a court evaluates four factors:

> 1) an assessment of whether the specific language in issue has a precise
> meaning which is readily understood or whether it is indefinite and
> ambiguous; (2) a determination of whether the statement is capable of
> being objectively characterized as true or false; (3) an examination of the
> full context of the communication in which the statement appears; and (4)
> a consideration of the broader social context or setting surrounding the
> communication including the existence of any applicable customs or
> conventions which might "signal to readers or listeners that what is being
> read or heard is likely to be opinion, not fact."

Steinhilber v. Alphonse, 68 N.Y.2d 283, 292 (1986). If a statement of opinion implies that it

is based on facts that support the opinion, but are unknown to persons reading or hearing it,

the statement is an actionable "mixed opinion." Id. at 289. However, a statement of opinion

made after a recitation of facts disclosed to the reader or listener, or not based on facts

unknown to the reader or listener, is not actionable. Gross v. New York Times Co., 82

N.Y.2d 146, 153 (1993). "The essential task is to decide whether the words complained of,

considered in the context of the entire communication and of the circumstances in which they

were spoken or written, may be reasonably understood as implying the assertion of

undisclosed facts justifying the opinion." Steinhilber, 68 N.Y.2d at 290. "The question is

one of law for the court and one which must be answered on the basis of what the average

person hearing or reading the communication would take it to mean." Id. The plaintiff has

the burden "to establish that in the context of the entire communication a disputed statement

is not protected opinion." Celle, 209 F.3d at 179.

Finally, under New York law, a qualified privilege generally immunizes from

defamation claims any communications made in the employment context. Albert v. Loksen,

239 F.3d 256, 272 (2d Cir. 2001). This qualified privilege protects communications made by

one person to another regarding a subject in which both parties have a common interest. Foster v. Churchill, 87 N.Y.2d 744, 751 (1996). The New York Court of Appeals has applied this privilege to statements made by members of a faculty tenure committee. See, e.g., Stukuls v. State, 42 N.Y.2d 272, 280 (1977). See generally New York Inst. of Tech. v. State Div. of Human Rights, 40 N.Y.2d 316, 322 (1976) (recognizing the deference that courts should accord generally to employment decisions in higher education). This qualified privilege of employment-related communications often dovetails with the absolute privileges of truth and opinion. "Under New York law, the evaluation of an employee's performance, even an unsatisfactory evaluation, is a matter of opinion that cannot be objectively categorized as true or false and cannot be actionable." Brattis v. Rainbow Adver. Holdings, L.L.C., 2000 WL 702921, at *4 (S.D.N.Y. May 31, 2000) (collecting cases). "The rationale for applying the privilege in these circumstances is that so long as the privilege is not abused, the flow of information between persons sharing a common interest should not be impeded." Liberman v. Gelstein, 80 N.Y.2d 429, 437 (1992).

To puncture the qualified privilege and establish liability, the plaintiff must show that the defendant made untrue statements and abused the privilege by "acting beyond the scope of the privilege, acting with common law malice, or acting with knowledge that the statement was false or with a reckless disregard as to its truth." Boyd, 208 F.3d at 410. See also Golden v. Stiso, 279 A.D.2d 607, 608 (2d Dep't 2001) (holding that the plaintiff has the burden to show that the defendant was motivated "solely by malice" to puncture the qualified privilege). Malice is defined as either a reckless disregard for the truth, or a motivation arising from spite and ill will. Liberman, 80 N.Y.2d at 438. To show a reckless disregard for the truth, there "'must be sufficient evidence to permit the conclusion that the defendant in

12

fact entertained serious doubts as to the truth'" of his or her statements.  Id. (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1964)).  Indeed, the plaintiff "may not rely on falsity alone to raise an inference of malice." Micalizzi v. Ciamarra, 206 F. Supp. 2d 564, 583 (S.D.N.Y. 2002).  Moreover, evidence of prior disputes is not evidence of malice, nor are "[s]uspicion, surmise and accusation." Shapiro v. Health Ins. Plan of Greater N.Y., 7 N.Y.2d 56, 64 (1959).

I now address each of the defendants' disputed statements.

1.  Professor Nier

A.  Statement involving plaintiff's role in the Knitwear Committee

At the department meeting of February 25, 2003, Defendant Nier stated the following:

> Due to [Donofrio's] failure to acknowledge the work of the Knitwear Committee she has made it impossible to bring the work of the committee to the department, even though the BFA Knitwear Track was written by January 2000 and the AP Knitwear courses written by February and March of 2000.  The knitwear subcommittee spent over a year working with the Knitwear Advisory Board before writing the tract and the courses.

(Compl. ¶¶ 56-57)  In her deposition, Donofrio testified that she joined the Knitwear Committee in September 2000 when defendant Nier was its chair.  (Donofrio Dep. at 251) Donofrio stated that she had no basis to dispute that the committee had drafted these documents prior to her joining it, aside from her opinion that Nier had a practice of postdating various documents.  (Donofrio Dep. at 252)  Plaintiff further testified in her deposition that prior to joining the Knitwear Committee in September 2000, she did not know what work the committee was performing.  (Donofrio Dep. at 277-78)

Viewed in the context in which the statement was made, Nier's remark that "[d]ue to [Donofrio's] failure to acknowledge the work of the Knitwear Committee she has

made it impossible to bring the work of the committee to the department," was a statement of her opinion regarding Donofrio's role on the Knitwear Committee. (Compl. ¶ 56) Indeed, in her deposition testimony, Donofrio offered her contrary opinion of the source of the committee's difficulties—that Nier inadequately performed her job as committee chair. To the extent that Nier's statement claimed that Donofrio's actions made the work of the committee "impossible", no reasonable jury could, in the context of the statement, conclude that it was anything but hyperbole. Steinhilber, 68 N.Y.2d at 292 (directing courts to consider the entire context of the allegedly defamatory statement). Nier's statement as to Donofrio's role in causing a delay in the work of the committee cannot be objectively characterized as true or false, and, under New York law, is non-actionable opinion. Id.

The remainder of the statement set forth the dates and time frames under which the Knitwear Committee was functioning prior to the time that Donofrio joined it. Plaintiff maintains in her affidavit that the courses written by the Committee had never been discussed until October or November 2000. (Donforio Aff. ¶ 22) Yet, Donofrio contradicted this assertion in her deposition when she stated that she was personally unaware of the Committee's work prior to September 2000. (Donofrio Dep. at 277) A party cannot defeat summary judgment by submitting an affidavit that contradicts prior sworn deposition testimony. See, e.g., Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995) ("[I]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").

The portion of Neir's statement that criticized Donofrio related to her role as a cause of delay of the committee's work and that, as a matter of law, was opinion. The balance of the statement as to the specific time frame when the committee completed its

work was not a statement directed at Donofrio and thus was not actionable. Boyd, 208 F.3d at 409. Viewing the facts most favorably to the plaintiff and applying New York's stringent standard for defamation claims, no reasonable jury, properly instructed, could find the statement to have been defamatory as to plaintiff. Alternatively, the statements are protected under the qualified privilege New York extends to communications in furtherance of a common interest such as statements to and from fellow employees for the purpose of evaluating the work of a co-employee. Stukuls, 42 N.Y. 2d at 280.

B. Statement involving responsibility for software donation

The other statement by Nier that plaintiff claims is defamatory relates to the donation of PrimaVision software, a design program used in the apparel and textile industry:

> [Donofrio] has claimed responsibility for the donation of 50 PrimaVision software packages. I have a letter dated December 20, 1999 that clearly identifies Sandra Ferrara as being responsible for the donation. It was valued at the time at [$1,500,000].

(Pl. Resp. to Def. 56.1 ¶ 68) Nier's remarks about Donofrio's role in procuring these software packages indirectly referred to an ongoing departmental controversy concerning the donation of expensive computer software. In a letter dated December 20, 1999 bearing the letterhead of "The Design System Primavision by Cadtex" and addressed to FIT's computing and technology dean, Jakim Notea stated that he was "pleased to announce to you the donation 50 copies of PRIMA Apparel and Textile Design System, valued at $1,500,000." (Def. Ex. O) The letter explicitly states that "Sandra Ferrara was very instrumental in making this donation happen. We appreciate her efforts and time in making sure that FIT is a major Primavision site." (Def. Ex. O) Nier testified at her deposition that she also was aware of a second letter from an individual named Lisa Berg at a company named Lectra, which indicated that Donofrio was responsible for a donation of Primavision software. (Nier

Dep. at 30)  Nier describes Lisa Berg as "a low level employee," and states that when she saw the Berg letter, she did not believe its assertions.  (Nier Dep. at 150)  Nier made no further attempts to contact any other Lectra employees concerning Donofrio's role in procuring PrimaVision software.  (Nier Dep. at 150-51)  Non-party Professor Carol Adelson, who chaired FIT's fashion design department, testified at her deposition that she called Lisa Berg, who stated that Donofrio was responsible for the software donation.  (Adelson Dep. at 93)  However, Adelson stated that she had no knowledge of who was responsible for the donation beyond what she was told by Berg and Lectra.  (Adelson Dep. at 93-94)  In a letter dated December 10, 2001, Adelson thanked Ferrara for procuring the software donation.  (Def. Ex. R)

A memorandum from Prima, which is dated November 30, 1999 and addressed to Adelson, thanks FIT for developing courses incorporating PrimeVision software.  (Def. Ex. Q)  It contains an unintelligible authorized signature dated November 30, 1999; Adelson's signature, which is dated "5/00"; and handwritten notation in the upper-right corner, which reads, "Hand deliv. on 5/4/00 by Lisa Donofrio to 119 W 40th St."  (Def. Ex. Q)

In her affidavit, Nier states that Donofrio claimed credit for the PrimaVision donation, when, in fact, Professor Sandra Ferrara "had been acknowledged" as the person responsible for bringing the donation to FIT.  (Nier Aff. ¶¶ 42-43)  Nier's affidavit depicts a circumstance in which Ferrara was primarily involved in arranging for the donation, after which plaintiff Donofrio then assisted with logistical follow-through in facilitating the donation.  (Nier Aff. ¶¶43-48)  Nier states that she expressed her opinion at the February 25

meeting out of concern that Donofrio had refused to acknowledge Ferrara's role in procuring the software. (Nier Aff. ¶ 48)

The parties clearly disagree as to whether the Berg letter deserves more weight than the Notea letter. However, it is clear that at the time she spoke at the February 25 meeting, Nier was familiar with both the Berg letter and the Notea letter, and did not credit the Berg letter. (Nier Dep. at 150) I cannot and need not resolve on this motion whether the Notea letter or the Berg letter is the more accurate rendition of facts. Rather, the relevant question on this motion for summary judgment is whether Nier's statement, viewed in the light most favorable to plaintiff and taking full account of its context, could be defamatory under New York law.

Defendant Nier's remarks, read from a written statement at a tenure meeting, reflected Nier's opinions as to plaintiff's role in the donation of highly valuable teaching software. It was nothing more than Nier's assessment, based upon correspondence and other facts of which she was aware, of the credit or lack thereof to be given to Donofrio for a series of communications that resulted in the software donation. Nier cited to the Notea letter as support for her opinion that Ferrara was responsible for that donation, and the existence and text of that letter is undisputed. A conclusion of who should be "identified as being responsible" for this donation cannot be objectively categorized as true or false. Steinhilber, 68 N.Y.2d at 692. With the existence of the Notea letter undisputed, nothing in Nier's remarks can be categorized as demonstrably false and thus is not actionable.

Even if this statement were not protected as opinion, it would still warrant protection under New York's qualified privilege for employment-related communications because plaintiff has not shown that the qualified privilege should be punctured. Nothing in

the record indicates that Nier "in fact entertained serious doubt as to the truth" of her remarks, as would be necessary to establish actual malice, because her remarks were based on a letter sent by the software's donor. <u>Liberman</u>, 80 N.Y.2d at 438. Nier was aware of the Berg letter, but simply discredited the views it contained. This disagreement over the proper apportionment of recognition between faculty members does not rise to the level of showing reckless disregard for the truth. <u>Id.</u>

In terms of common law malice, the only possible evidence of spite or ill will to which plaintiff refers this Court in her brief opposing summary judgment are sworn statements by two other FIT professors, Marge Kit Kovic and Collette Wong. (Fish Affirmation, Exs. B and C) Neither letter, read most favorably to plaintiff, defeats defendants' motion. The Kovic statement discusses generally a history of negative remarks by Nier about the plaintiff. The Wong statement discusses the February 25 meeting and expresses Wong's surprise and distress at how plaintiff was treated; her version of events differs in only immaterial respects. Plaintiff argues that this is evidence of a "history of malice" on the part of Nier. The argument misapprehends the terms "spite" or "ill will" as defined in this context by the New York Court of Appeals:

> In this context, however, spite or ill will refers not to defendant's general feelings about plaintiff, but to the speaker's motivation for making the defamatory statements. If the defendant's statements were made to further the interest protected by the privilege, it matters not that defendant *also* despised plaintiff.

<u>Liberman</u>, 80 N.Y.2d at 439 (emphasis in original). In other words, plaintiff has the "burden of proving that malice was the one and only cause for the publication." <u>Stukuls</u>, 42 N.Y.2d at 282. No reasonable jury could properly find on this record that there was common-law malice on the part of Nier sufficient to defeat the qualified privilege.

2.  <u>Professor Sterlacci</u>

A.  <u>Statements involving students' evaluations of Donofrio</u>

Donofrio challenges statements that defendant Sterlacci made regarding student evaluations and peer evaluations of Donofrio's teaching abilities.  Professor Sterlacci noted the generally poor student evaluations submitted by students in Donofrio's knitwear classes:

> [Donofrio]'s student evaluations, which have been inconsistent throughout the past two years.  Of special note are those in Knitwear, her area of expertise.  Twice she received scores that were well below the college standard.  In the Fall of 2000 she received a score of 4.41 in AP 334 Hand Knit Design Concepts.  Negative student comments included "she is not willing to explain things," "she needs more patience," "needs more demonstrations," "leaves class room for long periods," "should be in class more often" and "punctuality not a virtue."  In Spring 2002 [Donofrio] received a score of 4.18 for AP 333 Knitwear Design Concepts.  Other negative student comments refer to her "condescending attitude toward students," "control issues" and "did not display she wanted to teach more things."

(Pl. Resp. to Def. 56.1 ¶ 98)  Donofrio contends that these remarks were defamatory.  She asserts that Sterlacci violated the CBA by reading the student evaluations at the meeting and by reporting on the student evaluations outside of Donofrio's presence.  (Donofrio Aff. ¶¶ 36-37)  Donofrio also states that she was not given an opportunity to rebut the content of these statements.  (Donofrio Aff. ¶ 38)  In addition, Donofrio states that Sterlacci "knowingly mislead [sic] the department when she quoted only negative comments from a Fall 2000 student evaluation," and "intentionally omitted" positive reviews from that semester.  (Donofrio Aff. ¶ 40)  Lastly, Donofrio contends that scores below 4.5 do not preclude tenure-track faculty from teaching the same course again, and identifies multiple faculty members as examples.  (Donofrio Aff. ¶¶ 43-47)

Again, none of the facts set forth by plaintiff supports a defamation claim. That Sterlacci's comments may have violated the terms of a collective bargaining agreement, does not determine whether the remarks were either truthful or a matter of opinion. Moreover, plaintiff does not dispute the existence of the negative reviews mentioned by Sterlacci. Truth is an absolute defense to defamation, and the truth of the offered statements fully protects them from plaintiff's claim. <u>Nyitray</u>, 1998 WL 67651, at *10. <u>See also</u> <u>Dillon v. City of New York</u>, 261 A.D.2d 34, 39 (1st Dep't 1999).

Plaintiff argues that there were additional reviews that were positive but were not shared at the meeting. Yet, even accepting as true plaintiff's assertion that Sterlacci failed to discuss positive student reviews, Sterlacci's remark that plaintiff's reviews "have been inconsistent" did not preclude the existence of positive reviews. Furthermore, labeling plaintiff's teaching reviews as "inconsistent" reflected Sterlacci's opinion. In this context, the term "inconsistent" lacks a precise meaning and cannot objectively be characterized as true or false. <u>Steinhilber</u>, 68 N.Y.2d at 292. Such opinion is entitled to absolute immunity from a defamation claim. <u>Celle</u>, 209 F.3d at 178; <u>Brattis</u>, 2000 WL 702921, at *4.

Plaintiff also asserts that Sterlacci defamed her when she stated: "[W]hen [Donofrio] received an extremely low score from one of her classes in Spring 2001, she got it expunged." (Compl. ¶ 63) The parties agree that the remark was made. (Pl. Resp. to Def. 56.1 ¶ 112)

In the class review to which the allegation refers, 12 students in one of plaintiff's classes gave her a cumulative score of 3.9 out of 6. (Def. Ex. I) According to Sterlacci's deposition testimony, when plaintiff learned of her 3.9 score, she called Sterlacci at home to say that she was concerned with her low score. (Sterlacci Dep. at 168-69)

Sterlacci testified that when plaintiff called, plaintiff asked whether anything could be done to erase the score. (Sterlacci Dep. at 169)

Plaintiff does not dispute these facts, but rather disputes the implication that she sought to have the score expunged because the score was low. Instead, plaintiff contends that she was motivated by a concern about the low student response rate upon which the score was based and not the score itself. (Donofrio Aff. ¶ 49) Plaintiff points out that an FIT faculty member could not request that a score be expunged simply because it is low. (Donofrio Aff. ¶ 49)

At most, plaintiff's argument is that Sterlacci should have provided more context to her comments about plaintiff's request to have the low score expunged and should have explained that the request was not because the score was low but because the response rate was low. Although this may have been a more complete description, the absence of information about the low number of responses does not make Sterlacci's statement false. It was true that when Donofrio received a low score in Spring 2001, she sought to have it expunged. Truth is an absolute defense to defamation, and therefore this statement is protected. Nyitray, 1998 WL 67651, at *10; Dillon, 261 A.D.2d at 39. Sterlacci may have negatively characterized the situation by referring to an "extremely low score," but such language constitutes opinion and thus is not actionable in defamation. Celle, 209 F.3d at 178; Brattis, 2000 WL 702921, at *4.

B. Statements involving peer evaluation of Donofrio

In addition to addressing student evaluations of Donofrio's teaching, Sterlacci spoke about Donofrio's faculty reviews in Fall 2000:

A faculty member noted that upon receiving a less then favorable peer
evaluation by a senior faculty member in Fall 2000, [Donofrio] insisted on
having another evaluation done.

(Compl. ¶ 64)  According to Donofrio's deposition testimony, in the first 18 months of an

instructor's tenure-track process, he or she is peer-reviewed twice per semester.  (Donofrio

Dep. at 109-10)  The tenure-track instructor is then reviewed once per semester.  (Donofrio

Dep. at 109)

In plaintiff's first teaching semester, plaintiff was reviewed by M. Kit Kovic,

a FIT professor.  (Def. Ex. K)  Kovic assigned plaintiff no scores of "excellent" or "very

good," five scores of "good," five scores of "satisfactory," and one score of "poor."[1]  (Def.

Ex. K)  Plaintiff testified at her deposition that she was unhappy with this score, and that she

communicated her displeasure with it.  (Donofrio Dep. at 184-85)  Donofrio submitted a

rebuttal statement that attempted to refute the Kovic review.  (Donofrio Dep. at 185)

Professor Carol Adelson, the then-chair of the Fashion Design Department, testified at her

deposition that she performed an additional evaluation of Donofrio's teaching after Donofrio

requested one.  (Adelson Dep. at 51-52)

Donofrio contends that Sterlacci "knowingly lied" when she informed the

department that Donofrio insisted upon a new evaluation.  (Donofrio Aff. ¶ 51)  The CBA

requires that if two evaluations conflict with each other, a third must be completed by the

department chair or another faculty member.  (CBA ¶ 17.3.1)  However, the fact that

Donofrio's complaint triggered a CBA-mandated review does not support plaintiff's

contention that Sterlacci's remarks were defamatory.  According to Donofrio's own

---

[1]  Kovic also submitted written comments that criticized the plaintiff's failure to incorporate clear visual
examples into her teaching lessons.  (Def. Ex. K)

testimony, she was displeased with the results of the Kovic review, she communicated her displeasure, and Adelson's review was the result.

Donofrio does not dispute the veracity of the defendants' account so much as she disputes Sterlacci's characterization of the facts. Essentially, the plaintiff asserts that Sterlacci's use of the word "insisted" conveyed a false impression that Donofrio was personally able to initiate a third faculty assessment, rather than triggering application of a CBA provision. This dispute goes toward the parties' disagreement as to how to characterize the circumstances surrounding Adelson's review and not to the relevant, undisputed fact that Donofrio was displeased with the Kovic review, and that her displeasure eventually led to Adelson's review. The truth of this portion of Sterlacci's statement defeats the defamation claim. Dillon, 261 A.D.2d at 39. Under New York Law, even the "substantial truth" of a statement will defeat a defamation claim. Nyitray, 1998 WL 67651, at *10.

Moreover, this is the type of dispute that the qualified privilege accorded to the tenure process was designed to avoid. Liberman, 80 N.Y.2d at 437; Brattis, 2000 WL 702921, at *4. A faculty member who frankly assesses a candidate for tenure need not strip his or her comments of all but bland and innocuous language in order to avoid a lawsuit brought by a disappointed candidate.

Although a plaintiff may puncture the qualified privilege with evidence of malice on the part of the defendant, Donofrio has failed, in the face of defendants' motion, to come forward with admissible evidence of facts of the type New York law accepts as sufficient to defeat the qualified privilege. Plaintiff notes Sterlacci's request in September 2002 that plaintiff vote for Nier for assistant department chair. (Donofrio Aff. ¶ 15) Plaintiff asserts that this constituted a threat because Sterlacci in June 2002 told her that "colleagues

supporting [plaintiff] for [her] full time position were concerned about [her] relationship to 'the other side'." (Donofrio Aff. ¶ 15)  Plaintiff now concedes that Sterlacci never explicitly threatened any action associated with Donofrio voting against Nier.  (Donofrio Aff. ¶ 15; Donofrio Dep. at 28)  However, given the implication that the "other side" did not include Nier, plaintiff construed this as Sterlacci threatening a loss of votes to plaintiff for her tenure position if she did not support Nier in her bid for assistant department chair.  Despite this interpretation, without more, no reasonable jury could conclude, based on this exchange between Sterlacci and plaintiff, that malice was the "one and only cause" of the allegedly defamatory statements eight months later.  <u>Stukuls</u>, 42 N.Y.2d at 282.  With facts closely resembling those in the instant case, the New York Appellate Division, Third Department, rejected a finding of malice for a defendant who had criticized a tenure candidate during a faculty meeting:

> The exercise of the defendant's equal or superior legal or social right, as chairman of the plaintiff's department, to express his honest although critical opinion of the plaintiff's performance of her duties precludes a finding that he was motivated solely by malice . . . .

<u>Leibowitz v. Szoverffy</u>, 80 A.D.2d 692, 693 (3d Dep't 1981) (affirming the grant of summary judgment).  The motion for summary judgment as to the peer evaluation discussion is granted.

### C. <u>Statements involving Donofrio's role as international coordinator</u>

Donofrio also alleges that Sterlacci uttered multiple defamatory statements about Donofrio's role as international coordinator that prevented her from obtaining tenure and permanent employment.  The first statement involved Sterlacci's reading a letter at the February 25 meeting that Sterlacci identified as written by Lisa Feuerherm, the FIT

International Fashion Design Program Coordinator in Florence, Italy. (Pl. Resp. to Def. 56.1 ¶¶ 76-77) The letter asserted that plaintiff inadequately screened applicants for the international program, resulting in problems with the program's functioning. (Donofrio Aff. ¶ 31) Plaintiff argues that the Feuerherm letter should not have been introduced into tenure considerations because Feuerherm was not a member of the Fashion Design Department. (Donofrio Aff. ¶¶ 28-30)

The assertion that plaintiff inadequately screened applicants constitutes opinion. The adequacy or efficacy of plaintiff's screening is a matter of judgment and degree. As a result, the language at issue in this statement lacks precise meaning and cannot be objectively characterized as true or false. Steinhilber, 68 N.Y.2d at 292. In fact, Donofrio responds to the Feuerherm letter with her own opinion that her screening was adequate, or at least that any inadequacies resulted from interviewing requests made by Dr. Dario Cortes, the Vice President of Academic Affairs. (Donofrio Aff. ¶¶ 32-34) Regardless whose opinion is more persuasive, neither is actionable as a defamation claim. Celle, 209 F.3d at 178; Brattis, 2000 WL 702921, at *4.

Plaintiff's defamation claim pertaining to this statement by Sterlacci reduces to an assertion that the department violated their own rules and procedures at the February 25 meeting. A procedural violation may or may not warrant relief under the CBA, but that alone does not state a claim in defamation.

Donofrio also challenges a statement that apparently went beyond the Feuerherm letter:

> [Donofrio] refused to screen all applicants for the IFD program, even at the request of the VP of Academic Affairs, which resulted in numerous problems for the International Program both here and abroad.

(Compl. ¶ 61)  There is a dispute between the parties regarding whether Dr. Cortes made any such request and whether Sterlacci actually made this statement at the February 25 meeting, but it is not material to the disposition of this summary judgment motion.  (Donofrio Aff. ¶¶ 31; Def. 56.1 ¶ 80)  Unlike other statements alleged by Donofrio to be defamatory, the question of whether Donofrio refused to screen all applicants for the IFD program could be proven true or false.  While this statement is not absolutely immune as opinion, it is protected by the qualified privilege recognized under New York law statements in pursuit of a legitimate common interest such as discussions in the court of faculty tenure decision meetings.  Liberman, 80 N.Y.2d at 437.  Sterlacci's remarks were necessary to the free flow of information during the tenure decision-making process, and plaintiff has not produced evidence sufficient to constitute malice and thus puncture the qualified privilege.

In addition to her statements regarding Donofrio's interviewing of students for the IFD program, Sterlacci stated that plaintiff exhibited "poor performance and lack of follow-through" in her role as international coordinator.  (Compl. ¶ 60)  She stated in full:

> [Donofrio] failed to inform the chairperson of her decision to quit the International Coordinator position.  Due to poor performance and her lack of follow-through, she was released from the position in Spring 2003 after consultation with the international office and the college administrators.

(Pl. Resp. to Def. 56.1 ¶ 129)  Plaintiff contends that this statement was defamatory, and asserts that rather than her quitting the international coordinator position, FIT opened the position to new applicants under Sterlacci's direction.  (Id.; Donofrio Aff. ¶ 53)

Plaintiff has failed to raise a genuine dispute of material fact as to the lack of truth or substantial truth of the statement.  It is undisputed that in fall 2002, plaintiff unilaterally opted not to continue with her appointment as international coordinator, and did not inform Sterlacci, the department chairperson, of her choice.  (Pl. Resp. to Def. 56.1 ¶

138)  In a memorandum dated January 17, 2003, Sterlacci informed plaintiff that she was relieved of her position as international coordinator.  (Pl. Resp. to Def. 56.1 ¶ 145; Donofrio Aff. ¶ 53)  Plaintiff apparently disputes the reasons for her release from the international coordinator position on the grounds that Sterlacci did not articulate those reasons prior to January 17, 2003.  (Donofrio Aff. ¶ 53)  Even assuming that Sterlacci did not do so, that would not contradict the rationale provided by Sterlacci in her statement about why FIT no longer wished Donofrio to continue in the position.  To the extent that there is room for disagreement about the motivation for this decision, such disagreement constitutes opinion that lies beyond a defamation claim.  <u>Celle</u>, 209 F.3d at 178; <u>Brattis</u>, 2000 WL 702921, at *4.

D.  <u>Statements involving industrial knitwear lab</u>

Finally, Sterlacci criticized plaintiff's lack of input as to the design for an industrial knitwear lab that FIT was proposing to construct:

> Although [Donofrio] was a participant in the early stages of the CC21 knitwear lab, after the first meeting, [Donofrio] was a non-contributor. She offered no help with the detailed plan for CC21, although she was hired for her knitwear expertise.

(Pl. Resp. to Def. 56.1 ¶ 105)  Donofrio contends that Sterlacci intentionally excluded her from critical drafts of the knitwear lab designs, and asserts that – contrary to Sterlacci's assertion – she was keenly involved and interested in the lab's design.  (Donofrio Aff. ¶ 48)

This statement constitutes Sterlacci's negative opinion and evaluation of Donofrio's performance in the context of the knitwear lab.  <u>Celle</u>, 209 F.3d at 178; <u>Brattis</u>, 2000 WL 702921, at *4.  Viewed in the overall context of the comments (as New York law requires), the statement as to whether she was a "non-contributor" or offered "no help" for a given project was a matter of opinion.  <u>Steinhilber</u>, 68 N.Y.2d at 292.  Donofrio offers a different evaluation of her own performance, and indeed such conflicting evaluations may be

the basis for vigorous debate among faculty considering a tenure candidacy. Alternatively, the statement is protected by the qualified privilege. One colleague's expression of negative views of another's job performance during a job-related discussion is protected by the qualified privilege. <u>Liberman</u>, 80 N.Y.2d at 437.

II.     <u>Defendants' motion is granted as to plaintiff's tortious interference claims.</u>

Defendants argue that plaintiff's tortious interference claim should be dismissed because defendants Sterlacci and Nier were not "third parties" to plaintiff's employment relationship with FIT. In addition, these defendants assert that, in response to their motion, plaintiff has come forward with no evidence that they engaged in any "wrongful means" to interfere with that relationship.

Under New York law, the elements of a tortious interference claim are: "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to plaintiff." <u>Albert v. Loksen</u>, 239 F.3d 256, 274 (2d Cir. 2001). If the first element is absent, a plaintiff may still maintain a tortious interference claim. <u>Id.</u> Specifically, in at-will employment where no contract exists, a plaintiff may still maintain a tortious interference action but only in "certain limited situations." <u>Id.</u> "To do so, he or she must establish that a third party used wrongful means to effect the terminations such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to plaintiff, or that the defendant acted with malice." <u>Id.</u> Moreover, a plaintiff may allege tortious interference with prospective contract rights, but New York law requires a higher degree of culpable conduct on the part of the defendant. <u>See</u> <u>Liberty Envtl. Sys. v. County of</u>

Westchester, 1998 WL 799158, *5 (S.D.N.Y Nov. 16, 1998) (citing NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group, Inc., 87 N.Y.2d 614, 621 (1996)).

The tortious interference claim here fails because Nier and Sterlacci are not "third parties" to the employment relationship between Donofrio and FIT. A plaintiff may not sue a party to a contract for tortious interference with that contract. TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 88 (2d Cir. 2005). Generally, one may also not sue employees of a party to a contract, unless the plaintiff has shown that the defendant-employee has "exceeded the bounds of his or her authority." Finley v. Giacobbe, 79 F.3d 1285, 1295 (2d Cir.1996). See also Farrell v. Hellen, 367 F. Supp. 2d 491, 505 (S.D.N.Y. 2005) ("The parties to a contract include the parties' agents and employees . . . ."). A tortious interference action may also lie against a co-employee who committed an independent tortious act against a plaintiff. Albert, 239 F.3d at 275 (collecting cases).

In response to defendants' motion, Donofrio has been unable to come forward with admissible evidence from which a reasonable jury could conclude that Nier or Sterlacci acted outside the scope of their respective authority. The statements made by Nier and Sterlacci that allegedly interfered with plaintiff's employment relationship were made during the course of a meeting intended to reach a decision on whether plaintiff should be granted tenure. As part of their own employment with FIT, defendants apparently had the right to attend this meeting and to express their views on plaintiff's prospect as a tenured professor. Donofrio has not alleged otherwise, nor has Donofrio asserted that defendants committed an independent tort—other than the failed defamation claims discussed above.

Furthermore, the qualified privilege for employment relationships that protects the statements uttered by defendants from plaintiff's defamation claims also

precludes a characterization of those statements as "wrongful means" for purposes of tortious interference. See Markovic v. New York City Sch. Constr. Auth., 2002 WL 22043, *11 (S.D.N.Y. Jan. 8, 2002) ("Thus, the TDX Defendants could not have been motivated solely by a desire to harm plaintiff; they were, at a minimum, partly motivated by a desire to benefit TDX financially."). As a result, plaintiff's tortious interference claim fails.


CONCLUSION

For the reasons outlined above, the defendants' motion for summary judgment is granted as to all claims asserted by plaintiff in this action. The Clerk is directed to enter judgment in the defendants' favor.

SO ORDERED.

P. Kevin Castel
United States District Judge


Dated: New York, New York
         September 21, 2005